Filed: September 7, 2006

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

No. 04-4519(L)
(CR-03-296-LMB)

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

MASOUD AHMAD KHAN,

Defendant - Appellant.

O R D E R

The court amends its opinion filed September 1, 2006, as follows:

On page 5, final paragraph, line 3, and on page 6, line 1 -- "Dar al Argam" is corrected to read "Dar al Arqam."

For the Court - By Direction

/s/ Patricia S. Connor
Clerk

## PUBLISHED

# UNITED STATES COURT OF APPEALS
### FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

MASOUD AHMAD KHAN,
*Defendant-Appellant.*

No. 04-4519

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

SEIFULLAH CHAPMAN,
*Defendant-Appellant.*

No. 04-4520

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

HAMMAD ABDUR-RAHEEM,
*Defendant-Appellant.*

No. 04-4521

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

MASOUD AHMAD KHAN,
*Defendant-Appellant.*

No. 05-4811

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

          v.                                    No. 05-4818

SEIFULLAH CHAPMAN,
          *Defendant-Appellant.*


UNITED STATES OF AMERICA,
          *Plaintiff-Appellant,*

          v.                                    No. 05-4893

HAMMAD ABDUR-RAHEEM,
          *Defendant-Appellee.*


Appeals from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Leonie M. Brinkema, District Judge.
(CR-03-296-LMB)

Argued: May 25, 2006

Decided: September 1, 2006

Before WIDENER and DUNCAN, Circuit Judges, and
Joseph R. GOODWIN, United States District Judge
for the Southern District of West Virginia,
sitting by designation.

Affirmed in part; remanded in part by published opinion. Judge Duncan wrote the majority opinion, in which Judge Widener joined. Judge Goodwin wrote a separate opinion concurring in part and dissenting in part.

## COUNSEL

**ARGUED:** John Kenneth Zwerling, ZWERLING, LEIBIG & MOSELEY, P.C., Alexandria, Virginia; Jonathan Shapiro, Alexandria, Virginia; William B. Cummings, Alexandria, Virginia, for Appellants. Gordon Dean Kromberg, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee. **ON BRIEF:** Paul J. McNulty, United States Attorney, Alexandria, Virginia, for Appellee.

---

## OPINION

DUNCAN, Circuit Judge:

Defendants Masoud Khan ("Khan"), Seifullah Chapman ("Chapman"), and Hammad Abdur-Raheem ("Hammad") appeal their convictions after a bench trial on various counts related to a conspiracy to wage armed conflict against the United States and a conspiracy to wage armed conflict against a country with whom the United States is at peace. Khan and Chapman also appeal those portions of their sentences related to multiple violations of 18 U.S.C. § 924(c). The government cross-appeals the district court's decision to sentence Hammad significantly below the range recommended by the Sentencing Guidelines.

For the reasons explained below, we affirm the convictions of all three defendants as well as the sentences of Khan and Chapman. However, we reverse Hammad's sentence as unreasonable and remand to the district court for re-sentencing.

Because of the lengthy and complex background of this case, we initially describe the facts and procedural history generally applicable to all of the defendants. Facts specific to each defendant will be set forth in the discussion of the arguments of each.

I.

Between 1999 and September 11, 2001, Khan, Chapman and Hammad attended the Dar al Arqam Islamic Center in Falls Church, Virginia where Ali Timimi ("Timimi"), a primary lecturer, spoke of the necessity to engage in violent jihad[1] against the enemies of Islam and the "end of time" battle between Muslims and non-Muslims. Several of the attendees, including Chapman and Hammad, organized a group to engage in activities in preparation for jihad.

In the spring of 2000, members of the group began simulating combat through paintball exercises[2] and practices at firing ranges. By early summer, the group was meeting every other weekend. Chapman, Hammad, and others brought AK-47 style rifles to paintball training and also practiced marksmanship. Members were required to follow three rules: don't tell anyone, don't bring anyone, and invoke the Fifth Amendment right against self-incrimination if questioned by the police.

Because Hammad and Chapman had prior military experience, they assisted in leading the paintball drills and conducting the training. Chapman eventually took over and increased the drills' intensity. Chapman told the group that members were going to learn to fight; he enforced Draconian training and imposed physical punishment for infractions of rules that were out-of-character for a recreational paintball pastime. For example, being made to push a car in neutral was the punishment meted out for tardiness. The group also learned combat skills, such as how to avoid a helicopter attack, that appear inconsistent with a recreational pursuit.

Members of the group had ties to Lashkar-e-Taiba ("LET"), the military wing of a Pakistani organization initially founded to conduct jihad against Russians in Afghanistan. Between 1999 and 2003, LET primarily focused on expelling India from Kashmir. Both through its

---

[1]Jihad is "a holy war undertaken as a sacred duty by Muslims." Webster's Unabridged Dictionary 1029 (2nd. ed. 2001).

[2]Paintball is a game that simulates military combat in which players on one team try to eliminate players on the opposing team by shooting capsules of water-soluble dye at them from air powered rifles.

website and through other means, LET proclaimed its support for and involvement in a number of violent acts, particularly against India. In addition, LET advertised that it provided free jihad training camps in Pakistan.

One member of the paintball group, Mr. Hamdi, openly discussed wanting to go to fight in Kashmir and ultimately die as a martyr in combat. Hamdi traveled to Pakistan in August 2000 and was admitted to the LET camps. While there, he fired on Indian positions in Kashmir. Upon his return, he rejoined the paintball group and informed the others about LET's mission to destroy India, Israel, and the United States.

In September 2000, FBI agents visited Chapman and asked him about the paintball activities. After this interview, members of the group discussed whether they should continue in light of the government's knowledge of their activities. They decided to do so, but with heightened secrecy.

Seeking more intense and realistic fighting experience in the summer of 2001, Chapman traveled to the LET camps in Pakistan. While there, he participated in training and fired various rifles and handguns, including at least one automatic weapon. During that time, Chapman also met an LET official in Pakistan by the name of Singh. In 2002, Singh tried to purchase over the internet a wireless video module and a control module for use in an unmanned aerial vehicle ("UAV"). Singh selected an airborne video system with a camera and transmitter able to transmit video images from a UAV back to a receiver from as far as 15 miles away. The video camera could be used in military reconnaissance and in helping aim artillery and other weaponry across enemy lines. Singh placed his order from England, but the vendor was unable to confirm the overseas credit card. Chapman and Khan assisted Singh in completing the purchases. In the summer of 2002, Singh visited Virginia, staying first with Chapman and then with Khan.

The terrorist attacks of September 11, 2001, affected both the focus of the paintball group and the relationship of its members to the Dar al Arqam Islamic Center. That night, Timimi argued that the attacks should not be condemned. He was thereafter not invited to lecture at

Dar al Arqam, and the tapes of his speeches were destroyed. However, on September 16, 2001, Timimi met with the paintball group, including Khan and Hammad, at a member's house. Chapman, still at the LET camps, was not present. Timimi said that the September 11 attacks were justified and that it was the obligatory religious duty of those present to defend the Taliban against the American troops that were expected to invade Afghanistan in pursuit of Al-Qaeda. The discussion focused on training at the LET camps as necessary preparation to fight with the Taliban against the United States. Several of the members, including Khan, expressed their intent to train at the LET camps and to fight in Afghanistan after their training was complete. For purposes of their travel, they agreed that Khan would be their "emir," or leader.

Khan trained at the LET camps for approximately six weeks. During that time, he traveled through four different camps and received training in commando tactics, reconnaissance, hand-to-hand combat, and survival skills. He received instructions on and used weapons, including AK-47 automatic rifles, machine guns, anti-aircraft guns, rocket-propelled grenades, and mines. He performed sentry duty and routine maintenance tasks for LET. During this time, Khan left the camps on personal business at least once and returned shortly thereafter.

American troops began a ground war against the Taliban on or about October 20, 2001. By mid-November 2001, American and allied troops were defeating Taliban forces throughout northern Afghanistan. On November 13, 2001, the Taliban withdrew from the Afghan capital of Kabul, and forces allied with the United States took control of the city. By November 15, Taliban forces had retreated to Kandahar. In November 2001, while at LET camp, Khan learned through radio reports that American forces were quickly defeating the Taliban in Afghanistan. Further, he learned that Pakistan had closed its border with Afghanistan and that LET would not facilitate his travel there. Moreover, Pakistani authorities were aggressively removing foreigners from the camps. As a result, Khan left the camps in the fall of 2001 without ever having reached Afghanistan.

The government's investigation into the activities of Khan, Chapman, Hammad, and their colleagues became public in February 2003,

when a search warrant was executed at Timimi's house. On March 24, 2003, the FBI approached Caliph Abdur Raheem ("Caliph"), one of the paintball members who was tried with defendants in this case and acquitted, and obtained a statement from him. Caliph told the FBI that paintball was used for jihad training and that the reason the trainees had acquired AK-47-style rifles was that they were the type of weapon used overseas. When Hammad learned of the admissions, he called a colleague with the "bad news" that Caliph had "cracked."

As a result of the government's investigation, Hammad, Chapman, and Khan, along with eight others—Caliph, Donald Surratt II, Yong Ki Kwon, Muhammed Aatique, Khwaja Hasan, Randall Todd Royer, Ibrahim Ahmed Al-Hamdi, and Sabri Benkhala—were indicted in June 2003 for various offenses concerning a conspiracy to engage in military expeditions against India and the United States.

Surratt, Kwon, Aatique, and Hasan all pleaded guilty before trial and cooperated with the government. As a result of their assistance, a superseding indictment was returned against the remaining seven defendants in September 2003.[3] Because of his attempts to fight with the Taliban, Khan was charged with a conspiracy to levy war against the United States, a conspiracy to provide material support to Al-Qaeda, and a conspiracy to contribute services to the Taliban. Neither Chapman nor Hammad was charged with these conspiracies.

In January 2004, Royer and Hamdi pleaded guilty. Benkhala was tried separately and acquitted. The government proceeded against Caliph, Chapman, Hammad, and Khan. Chapman and Hammad moved to have their trial severed from Khan's, arguing that evidence that would be presented against Khan would prejudice their right to a fair trial. The district court denied the motion for severance. Chapman, Hammad, and Khan then moved for a bench trial, which the district court granted.[4]

---

[3]Because the government proceeded against all seven defendants in a single thirty-two count indictment, not every count of the indictment applied to each defendant.

[4]Caliph moved separately for severance of his trial from Khan's and, in the alternative, for a bench trial. His motion for severance was denied, but his motion for a bench trial was granted.

At trial, the government presented the statements made by Caliph to the FBI that the paintball activities were intended to be training for jihad, and that the trainees had obtained AK-47 style weapons because that was the type of weapon used in combat overseas. After the government's presentation of evidence against him, Caliph moved for an acquittal pursuant to Federal Rule of Criminal Procedure 29. The district court granted that motion. As a result, Caliph never testified, and his co-defendants had no opportunity to cross-examine him concerning his statements.

At the conclusion of the bench trial, the district court wrote a comprehensive opinion detailing the evidence against the three remaining defendants and referencing the wealth of cumulative evidence of record. Khan was acquitted on four counts and convicted on the following eight counts: (1) one count of conspiracy to enlist in armed conflict against the United States in violation of 18 U.S.C. §§ 371, 2390; (2) one count of conspiracy to levy war against the United States in violation of 18 U.S.C. § 2384; (3) one count of conspiracy to contribute services to the Taliban in violation of 50 U.S.C. § 1705; (4) one count of conspiracy to contribute material support to LET, knowing and intending that it was to be used in preparation for and in carrying out a conspiracy to kill or injure persons in a foreign country with which the United States is at peace in violation of 18 U.S.C. § 2339A; and (5) four counts of conspiracy to use firearms in relation to a crime of violence in violation of 18 U.S.C. § 924. Chapman was acquitted on two counts, but convicted on the following five counts: (1) one count of conspiracy to violate the Neutrality Act (18 U.S.C § 960); (2) one count of conspiracy to contribute material support to LET, knowing and intending that it was to be used in preparation for and in carrying out a conspiracy to kill or injure persons in a foreign country with which the United States is at peace in violation of 18 U.S.C. § 2339A; and (3) three counts of conspiracy to use firearms in relation to a crime of violence in violation of 18 U.S.C. § 924. Hammad was acquitted on four counts, but convicted on the following three counts: (1) one count of conspiracy to violate the Neutrality Act (18 U.S.C § 960); (2) one count of conspiracy to contribute material support to LET, knowing and intending that it was to be used in preparation for and in carrying out a conspiracy to kill or injure persons in a foreign country with which the United States is at peace in violation of 18 U.S.C. § 2339A; and (3) one count of conspiracy to use

firearms in relation to a crime of violence in violation of 18 U.S.C. § 924. The district court noted that it included in its opinion only a fraction of the facts supporting the convictions and that it could have, with time, included four times as many facts in its opinion in support of its conclusions.

Before the initial appeals of these convictions were briefed, the case was remanded for re-sentencing in light of *United States v. Booker*, 543 U.S. 220 (2005). At re-sentencing, the district court chose to sentence Hammad well below the range recommended by the Sentencing Guidelines, concluding that Hammad's sentence should be similar to the sentence of Surrat because, in the district court's opinion, Surrat and Hammad were similarly situated.

Khan, Chapman, and Hammad now timely appeal their convictions and sentences on various grounds. The government timely cross-appeals Hammad's sentence, arguing that it constitutes an unreasonable variance from the recommended Sentencing Guidelines range. We first address each defendant's individual argument that, with respect to one or more counts of the indictment, there was insufficient evidence to support his conviction. We next address the arguments that apply to the defendants as a group concerning the validity of their convictions and sentences. We conclude by addressing the government's cross-appeal.

## II.

Each of the defendants first challenges his convictions, arguing that they were not supported by sufficient evidence. When we assess the sufficiency of the evidence of a criminal conviction on direct review, "[t]he verdict of [the] jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." *Glasser v. United States*, 315 U.S. 60, 80 (1942). We address each argument in turn.

### A. Khan's Convictions

#### 1.

Khan argues that there was insufficient evidence presented at trial to support his convictions for (1) Count One, conspiracy to enlist in

armed conflict against the United States in violation of 18 U.S.C. §§ 371, 2390; (2) Count Two, conspiracy to levy war against the United States in violation of 18 U.S.C. § 2384 and (3) Count Four, conspiracy to contribute services to the Taliban in violation of 50 U.S.C. § 1705(b). We disagree.

The essential elements of Count One, as applied to Khan, are (1) a conspiracy (2) to enlist or engage within the United States or any place subject to the jurisdiction thereof, (3) with intent to serve in armed hostility against the United States. 18 U.S.C. §§ 371, 2390. The essential elements of Count Two are (1) a conspiracy (2) to overthrow, put down, or to destroy by force the Government of the United States, or to levy war against them, or to oppose by force the authority thereof, or by force to prevent, hinder, or delay the execution of any law of the United States, or by force to seize, take, or possess any property of the United States contrary to the authority thereof. 18 U.S.C. § 2384. The essential elements of Count Four are (1) a conspiracy (2) to willfully make or receive any contribution of funds, goods, or services, to or for the benefit of the Taliban. 50 U.S.C. § 1705(b); 31 C.F.R. § 545.201-545.208.

There was sufficient evidence to support the district court's findings of guilt on all of these counts. When the group members were meeting and discussing going to Afghanistan to aid the Taliban against the United States, Khan exhorted the others to go with him to Afghanistan because "the cowards and the weak hearted are the first to run away." J.A. 1013. Khan did, in fact, travel to Pakistan to engage in training in the LET camps, and there was evidence that Khan intended to go to Afghanistan to fight with the Taliban against the United States after training. Khan was also selected as the leader of the group when they arrived in Pakistan. All of the group members that Khan led directly testified that they intended to engage in armed hostilities against the United States. The district court found their testimony to be credible; indeed, it was unrebutted. We conclude that this evidence amply supports the finding that Khan was guilty of Counts One, Two, and Four.[5]

---

[5]Khan also challenges his conviction under Count One on an additional ground, arguing that, as applied to him, Count Eleven and Count

2.

Khan next argues that there was insufficient evidence to support his conviction under Count Five, conspiracy to contribute material support to LET, knowing and intending that it was to be used in preparation for and in carrying out a conspiracy to kill or injure persons in a foreign country with which the United States is at peace, in violation of 18 U.S.C. § 2339A. While he concedes that he provided material support to LET, Khan contests that there was sufficient evidence to demonstrate that he knew that LET was intent on committing acts of murder or injury to others. We disagree.

The evidence reflects that LET broadly disseminated its goals for the destruction of India, America, and Israel on its web site and elsewhere. Khan was personally acquainted with Singh, an LET official, whom he assisted in purchasing paramilitary equipment. Even if Khan remained unaware of the nature of LET's activities before training in its camps, he was certainly aware of it by the time he returned to them after leaving temporarily because the LET camps were full of descriptions of LET's violent exploits. We therefore conclude that sufficient

One were identical offenses. A defendant cannot, of course, be punished for two crimes that constitute the "same offense." *Rutledge v. United States*, 517 U.S. 292, 297 (1996). "If 'the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.'" *Id.* (quoting *Blockburger v. United States*, 284 U.S. 299, 304 (1932)). In this case, Count One entailed a conspiracy to violate 18 U.S.C. § 2390 by enlisting to serve in armed hostility against the United States, while Count Eleven involved a violation of 18 U.S.C. § 924(o), conspiracy to possess and use firearms in connection with a crime of violence. Count One required that Khan engage in armed hostility, but Count Eleven did not. *Compare* 18 U.S.C. § 2390 *with* 18 U.S.C § 924(o). Count Eleven required the use of a firearm, but Count One did not. *Compare* 18 U.S.C. § 2390 *with* 18 U.S.C § 924(o). Because each Count required proof of a fact that the other did not, they are not the same offense, and the district court did not err in punishing Khan separately for each count.

evidence was introduced for a rational trier of fact to find the essential elements necessary for Khan's conviction under Count Five.[6]

## B. Chapman's Convictions

### 1.

The district court found Chapman guilty of Count One, conspiracy to violate the Neutrality Act, which makes it a crime to

> knowingly begin[ ] or set[ ] on foot or provide[ ] or pre- pare[ ] a means for or furnish[ ] the money for, or take[ ] part in, any military or naval expedition or enterprise to be carried on from thence against the territory or dominion of any foreign prince or state, or of any colony, district, or peo- ple with whom the United States is at peace.

18 U.S.C. § 960. The district court found that "Chapman and [Ham- mad] furthered the conspiracy by training co-conspirators in combat skills through paintball games and the acquisition of weapons, with the knowledge that some co-conspirators had already traveled to Kashmir and fired on Indian positions, and with the expectation that other co-conspirators would do the same, using the training that Chapman and [Hammad] provided." J.A. 3212-13.

Chapman argues that, even assuming that paintball was a form of jihad training, the evidence does not reveal any specific intent to join LET attacks in India. We cannot agree. The record contains evidence that Chapman continued to provide support to two members of the group who expressly acknowledged going to Pakistan and firing on Indian troops while there. Sufficient evidence, therefore, supports the

---

[6]Khan also challenges his convictions under Counts Eleven, Twenty- Four, Twenty-Five, and Twenty-Seven, conspiracy to use firearms in relation to a crime of violence, in violation of 18 U.S.C. § 924, for each of the four counts discussed above. Khan acknowledges that he used a firearm in relation to those counts. Because, as discussed above, there was sufficient evidence to support his conviction on those counts, there was sufficient evidence to support his conviction for the related firearms counts.

district court's factual findings and, accordingly, the conspiracy conviction.

## 2.

Chapman next challenges his conviction under Count Five for conspiracy to provide material support to LET, a terrorist organization, in violation of 18 U.S.C. § 2339A. The thrust of Chapman's challenge in this regard is that much of the evidence the government relies upon to support his conviction on this count predates the statute criminalizing such conduct. Conspiracy to provide material support to terrorists was not made a crime until October 26, 2001; until that date, § 2339A was a substantive crime only.

Chapman's argument, however, overlooks the fact that, like Khan, he assisted Singh in purchasing parts for a UAV with video surveillance equipment designed primarily for military and scientific use. He provided this assistance after October 26, 2001. Export of this equipment was controlled by law; its uses as a "Military Unmanned Aerial Vehicle" include reconnaissance, weapons targeting, and similar military purposes. Even assuming that Chapman's ongoing training activities with the paintball group did not qualify as a conspiracy for purposes of § 2339A, the district court specifically found that providing paramilitary equipment to a known LET official certainly did, and we agree.

## 3.

Chapman challenges his conviction under Count Twenty for possessing a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c). In order to prove guilt under this statute, the government needs "to present evidence indicating that the possession of a firearm furthered, advanced, or helped forward" a crime of violence. *United States v. Lomax*, 293 F.3d 701, 705 (4th Cir. 2002). The district court found that Chapman's transfer of a Saiga .308 rifle to Hamdi in December 2000, knowing that Hamdi had traveled to LET camps and fired on Indian troops and was engaging in the paintball training to prepare for jihad, "furthered the conspiracy to violate the Neutrality Act." J.A. 3229. Because the transfer of the weapon furthered the conspiracy to violate the Neutrality Act, the district court

concluded, Chapman's possession of the weapon furthered the conspiracy. *Id.*

Chapman disputes the factual underpinnings of the district court's conclusion, arguing that "the evidence is unequivocal that it was not until January of 2002 that Hamdi told Chapman that he had fired on Indian positions in Kashmir." Appellants' Br. at 54. To the contrary, however, Hamdi testified that he told Chapman that he had fired on Indian positions in September of 2000, prior to the transfer of the weapon. This evidence was sufficient to support the district court's conclusion that Chapman possessed a rifle in furtherance of a violation of the Neutrality Act, a crime of violence.

4.

The district court found that Chapman was guilty as to Count Twenty-Two because, again in violation of 18 U.S.C. § 924(c), he used firearms while he was at the LET camp in furtherance of, among other crimes of violence, a conspiracy to violate the Neutrality Act and a conspiracy to provide material support to LET. Chapman challenges this finding, arguing that all he did was fire five bullets at a paper target at the LET camp and that the act did nothing to further any crimes of violence. There is no merit to this argument. Even if we were to credit, and we do not, his theory that firing "only" five bullets as training for the conspiracy to violate the Neutrality Act does not constitute use of a firearm for purposes of § 924(c), it ignores the testimony of Hamdi and others about the training in and extensive use of firearms at the LET camps. This evidence amply supports a finding that Chapman used firearms at the LET camp in furtherance of the conspiracy to commit a crime of violence.

C. Hammad's Conviction

Hammad was convicted under Count Five of conspiring to contribute material support to LET in violation of 18 U.S.C. § 2339A because he knowingly trained individuals through the paintball exercises in military techniques for use with LET. Hammad argues that he did not do so knowingly. Instead, he argues, he trained members of the group for recreation and physical fitness and did not train members of the group for LET after he learned that LET was engaged in

armed conflict with India.[7] This assertion, however, is belied by the record. Ample evidence demonstrates that Hammad continued to train people in his paintball group after he learned that some members of the group were going to work with LET in the fight against India. In light of the overwhelming evidence to the contrary, the district court expressly declined to "credit [Hammad's] testimony that paintball was strictly for recreation and physical fitness." J.A. 3207. We conclude that sufficient evidence supports Hammad's conviction for knowingly providing material support to LET in the form of trained personnel.

In short, we conclude that sufficient evidence supported all convictions for all defendants.

### III.

#### A. Denial of Motion to Sever

Defendants Chapman and Hammad argue that the district court erred in denying their motions to sever their trials from Khan's. They contend that the evidence admitted against Khan concerning the conspiracies to aid Al-Qaeda and the Taliban, which would not have been admitted against Chapman and Hammad in a separate trial, was so prejudicial as to deny them their right to a fair trial. We disagree.

"The grant or denial of a motion for severance . . . is within the trial court's discretion and will not be overturned absent a clear abuse of that discretion." *United States v. West*, 877 F.2d 281, 287-88 (4th Cir. 1989). "Generally, individuals indicted together should be tried together," *United States v. Strickland*, 245 F.3d 368, 384 (4th Cir. 2001) (internal quotation omitted), and "[a] defendant is not entitled

---

[7]Hammad also challenges his conviction under Count One for the same reasons as Chapman. We deny his challenge for the same reasons we deny Chapman's. *See, supra*, Section II. B. 2. Finally, Hammad challenges his conviction under Count Eleven, conspiracy to use firearms in relation to a crime of violence in violation of 18 U.S.C. § 924(o). Because evidence demonstrates that Hammad engaged in the sale and transfer of AK-47s among the conspirators, we find that sufficient evidence supports his conviction on this count.

to severance merely because separate trials would more likely result in acquittal, or because the evidence against one defendant is not as strong as that against the other." *Id.* (internal quotation omitted). A defendant must instead "show prejudice in order for the court's ruling to constitute an abuse of discretion. . . . Convictions should be sustained if it may be inferred from the verdicts that the [fact finder] meticulously sifted the evidence." *United States v. Porter*, 821 F.2d 968, 972 (4th Cir. 1987).

In this case, Chapman and Hammad fail to demonstrate prejudice resulting from the district court's ruling. The record instead shows that the judge, as factfinder, "meticulously sifted the evidence" against all of the defendants and did not demonstrate prejudice toward the other defendants based on the evidence admitted against Khan. Chapman was charged with seven counts and found not guilty of two of them. Hammad was charged with seven counts and found not guilty of four of them. Defendant Caliph was acquitted entirely. These particularized findings, along with the fact that defendants can point to no instances in the record in which the district judge displays prejudice toward defendants, indicate that the defendants each received a fair trial based on the evidence properly admitted against them and not on the evidence admitted against their co-defendants. We therefore hold that the district court did not abuse its discretion in refusing to sever Chapman and Hammad's trials from Khan's.

## B. Waiver of Jury Trial Rights

Their severance motion having been denied, Chapman and Hammad moved in the alternative for a waiver of jury trial pursuant to Federal Rule of Criminal Procedure 23.[8] Khan joined this motion, the

---

[8]The motion, which Chapman filed and Hammad joined, provided that

> [a]lternatively, [defendants] request[ ] that, if this court denies [their] renewed severance motion, then the court permit [them] to waive trial by jury. Under Rule 23(a), Fed. R. Crim. P., both the accused and the government must consent to the jury waiver. A bench trial would likely result in a much shorter trial and, most certainly, would afford the accused with the opportunity to receive a fair trial.

J.A. 220-21.

government agreed to the requested waiver, and the district court ultimately granted it. The court did not, however, obtain a signed jury trial waiver from the defendants as opposed to their counsel. The court also did not conduct any colloquy with defendants on the record concerning the waiver.

The three defendants now argue that the jury trial waiver was invalid because the district court did not obtain their written waiver or otherwise conduct a colloquy on the record to determine that their waiver was knowing, voluntary, and intelligent. *See, e.g., Adams v. United States*, 317 U.S. 269, 277-78 (1942) (noting that a defendant's waiver of a jury trial right must be competent and intelligent). We review this claim de novo. *United States v. Robertson*, 45 F.3d 1423, 1430 (10th Cir. 1995).

> Federal Rule of Criminal Procedure 23(a) states
>
> If the defendant is entitled to a jury trial, the trial must be by jury unless:
>
> > (1) the defendant waives a jury trial in writing;
> >
> > (2) the government consents; and
> >
> > (3) the court approves.

Fed. R. Crim. P. 23(a). Defendants rely heavily on cases, most notably *United States v. Robertson*, 45 F.3d 1423 (10th Cir. 1995), in which other circuits have suggested that a Rule 23(a) waiver presented by counsel is inadequate, absent some other showing to satisfy an appellate court that it was actually knowing, voluntary, and intelligent.

In this circuit however, we have not imposed such a requirement. In *United States v. Hunt*, 413 F.2d 983 (4th Cir. 1969), we held that, while it would be "better practice" for a district judge to interrogate a defendant who claims through counsel that he wants to waive his jury trial right, nothing in the applicable case law, Rule 23(a) itself, or the Constitution requires it. *Id.* at 984; *see also United States v.*

*Alvarez*, 1998 U.S. App. LEXIS 8788 at *6 (4th Cir.) (unpublished) ("We have held that an in-court colloquy to determine voluntariness of the waiver is good practice, but it is not required by the Constitution or Rule 23(a).").

In this case, we find that the record supports a conclusion that the waivers were voluntary, knowing, and intelligent, even though signed by counsel and in the absence of a colloquy. The motions for waiver here were made in the alternative to the motions for severance as a calculated part of the defendants' trial strategy to prevent "inflammatory and prejudicial evidence" from biasing a jury. J.A. 220.

Defendants Chapman and Hammad now claim that their waiver was not knowing or voluntary as a back door attack on the district court's denial of their motions to sever. In other words, these defendants argue that when the district court denied their motion to sever, the prospect of having a jury hear potentially inflammatory evidence against Khan forced them to relinquish their right to a jury trial. This argument is unpersuasive. Criminal defendants must frequently choose from among less than desirable alternatives. The fact that defendants would have preferred severed jury trials does not make their choice of a non-severed bench trial over a non-severed jury trial unknowing or involuntary.

In short, the record reflects that the defendants' Rule 23 waivers were a knowing, voluntary, and intelligent part of their trial strategy, and we uphold them as valid.

### C. The Validity of Counts Five and Eleven

All three defendants contend that Counts Five and Eleven are invalid because they constitute "conspiracies to conspire." Specifically, Count Five alleged a conspiracy to provide material support in carrying out a violation of 18 U.S.C. § 956, which criminalizes conspiracy to kill or injure persons or damage property in a foreign country. Count Eleven alleged a conspiracy to use firearms in connection with a conspiracy to commit a crime of violence. Because one cannot "conspire to conspire," defendants argue, these Counts should be dismissed. We disagree.

The facial validity of the statutes under which the defendants were charged presents a question of law which we review de novo. *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Corp.*, 65 F.3d 1113, 1123 (4th Cir. 1995).

Under Count Five, defendants were convicted of "conspir[ing] to," 18 U.S.C. § 2339A(a), "provide[ ] material support . . . intending that [it] be used . . . in carrying out . . . a violation of . . . [18 U.S.C. § 956]." J.A. 3220. Section 956, in turn, criminalizes "[c]onspiracy to kill, kidnap, maim, or injure persons or damage property in a foreign country." 18 U.S.C. § 956. Under Count Eleven, defendants were convicted of conspiring to use, carry, or possess a firearm in furtherance of, inter alia, a conspiracy to violate the Neutrality Act and a conspiracy to provide services to the Taliban. 18 U.S.C. §§ 924(c),(o); J.A. 3223. Both Count Five and Count Eleven, in other words, expressly allow one conspiracy to serve as the predicate for another conspiracy. Nothing about this statutory framework is unconstitutional, improper, or even unusual.

Courts have recognized that one conspiracy can serve as the predicate for another conspiracy when the "[overarching] conspiracy and the predicate conspiracy are distinct offenses with entirely different objectives." *United States v. Pungitore*, 910 F.2d 1084, 1135 (3rd Cir. 1990); *see also United States v. Ruggiero*, 726 F.2d 913, 918 (2nd Cir. 1984) (holding that conspiracies can serve as predicate acts for a RICO conspiracy); *United States v. Brooklier*, 685 F.2d 1208, 1216 (9th Cir. 1982) (same). In Count Five, the conspiracy to provide material support to terrorism represents a distinct offense with different objectives from the predicate conspiracy to kill a person. In Count Eleven, the conspiracy to use or possess a firearm represents a distinct offense with different objectives from the predicate conspiracy to violate the Neutrality Act or provide services to the Taliban. Therefore, the underlying conspiracies may properly serve as predicates for the overarching conspiracies alleged.

More fundamentally, the statutes in question expressly contemplate allowing one conspiracy to serve as the predicate offense for another conspiracy. Defendants point to no constitutional or other reason why these statutes should be struck down as invalid, and we find none.

D. Multiple Firearm Sentences for Multiple Predicate Offenses

Khan and Chapman next argue that it was error for the district court to sentence them separately for each separate 18 U.S.C. § 924(c) firearms offense because those offenses all related to the same criminal episode. Under our precedent, this argument fails.

This court has previously held, based on the plain language of the statute, that convictions for separate crimes of violence can lead to multiple sentences under § 924(c). *United States v. Luskin*, 926 F.2d 372, 376-77 (4th Cir. 1991). "There is no ambiguity in section 924(c). It states that whenever a person commits a crime of violence or drug trafficking crime and uses or carries a gun, the person shall be sentenced to a prison term that runs consecutive to the person's sentence for the underlying crime of violence or drug trafficking crime and consecutive to all other sentences." *Id.* at 376. As long as the imposition of multiple § 924(c) sentences does not violate the Double Jeopardy Clause, we will uphold those sentences in accordance with the plain language of the statute.[9] *Id.*

---

[9]The dissent argues that "[i]n applying *Camps* and *Luskin*, we must determine how many 'uses' are represented by the acts a defendant performed with firearms." Dissenting Op. at 35. This position may derive from the *Camps* language that "multiple, consecutive sentences under section 924(c)(1) are appropriate whenever there have been multiple, separate acts of firearm use or carriage, even when all of those acts relate to a single predicate offense." *United States v. Camps*, 32 F.3d 102, 106 (4th Cir. 1994). Extrapolating from *Camps*, the dissent asserts that "[f]rom the evidence, it is impossible to determine if Khan's firings had separate objectives, different effects on the conspiracy, or occurred at times not sufficiently proximate to justify multiple sentences. Evidence does not exist in the record to conclude the firings constitute separate and distinct 'uses' for sentencing purposes." Dissenting Op. at 36-37.

Here, however, Khan was convicted of *four* predicate crimes of violence, not a "single predicate offense," and we therefore need not count "uses." *See Camps*, 32 F.3d at 106. Though Khan's four crime-of-violence convictions may have arisen from his activities during a single month in October 2001, this court has expressly and consistently rejected the notion that the convictions should therefore be considered a single "episode" for purposes of underpinning a § 924(c) violation. *See United*

In order to determine whether consecutive § 924(c) sentences violate the Double Jeopardy Clause, "[t]he court must concern itself with whether the underlying crimes of violence supporting the § 924(c) charges are duplicative under a double jeopardy analysis. As long as the underlying crimes are not identical under the *Blockburger* analysis,[10] then consecutive § 924(c) sentences are permissible." *Id.*

Defendants concede that each of the underlying crimes of violence in this case supporting the § 924(c) charges "may be a separate offense for purposes of a *Blockburger* analysis," and, accordingly, that they do not run afoul of the Double Jeopardy Clause. Appellants' Reply Br. at 46. They, however, attempt to distinguish *Luskin*, arguing that both the indictment and the district court opinion listed all of the predicate counts on the same general factual allegation. That distinction, however, emphasizes an irrelevancy. The plain language of the statute does not speak of "general factual allegations" or a "course of conduct." Instead, it states that a defendant shall be given additional sentences for each "second or subsequent conviction." 18

---

*States v. Luskin*, 926 F.2d 372, 276 (4th Cir. 1991) (insisting that "there is no 'episode' test under section 924(c)," referring to the requirement in some circuits that the prerequisite convictions supporting a *§ 924(e)* violation be "distinct in time, rather than literal convictions" (quoting *United States v. Towne*, 870 F.2d 880, 889 (2d Cir. 1989))).

Instead, in this circuit the four crime-of-violence convictions are considered separate predicate offenses provided that they do not violate the Double Jeopardy Clause. As we discuss below, the defendants *concede* that those underlying crimes of violence constitute separate offenses and do not implicate double jeopardy concerns for purposes of *Blockburger*. "As long as the underlying crimes are not identical under the *Blockburger* analysis, then consecutive 924(c) sentences are permissible." *Luskin*, 926 F.2d at 377.

Because Khan's four crime-of-violence convictions constitute separate predicate offenses, each may support a consecutive § 924(c) sentence without requiring the court first to enumerate "uses" of firearms.

[10]Under the *Blockburger* analysis, multiple statutory provisions describe identical offenses unless "each provision requires proof of a fact which the other does not." *Blockburger v. United States*, 284 U.S. 299, 304 (1932).

U.S.C. § 924(c)(1)(C); *see also Deal v. United States*, 508 U.S. 129, 135 (1993) (noting that there is "utterly no ambiguity" in the meaning of the word "conviction" as used in § 924(c)). In other words, there is no housekeeping requirement under the statute or *Luskin* obliging either the government or the district court to present the facts in such a manner as to align the use of a particular firearm with a particular predicate offense. The fact that the district court chose to present the facts of this case as one list of factual allegations does not mean that the crimes that derived from those factual allegations were all identical as a matter of law.[11]

### E. Section 924(c) Sentence as Unconstitutional

Citing *United States v. Angelos*, 345 F. Supp. 2d 1227 (D. Utah, 2004), defendants argue that the lengthy sentences imposed by the "count-stacking" provisions of § 924(c) are so long as to constitute a violation of due process, equal protection, and the Eighth Amendment prohibition against Cruel and Unusual punishment. In *Angelos*, the district court opined that § 924(c) can mandate sentences that are outside of "the realm of reason." *Id.* at 1261. Notwithstanding his personal opinion, however, the district judge concluded that the relevant precedent compelled him to impose the sentence mandated by the statute. *Id.* We agree with the *Angelos* court that we are bound by precedent to uphold the constitutionality of the § 924(c) sentences imposed in this case.

Defendants' Eighth Amendment argument is simply unavailing. "Severe, mandatory penalties may be cruel, but they are not unusual in the constitutional sense, having been employed in various forms throughout our Nation's history." *Harmelin v. Michigan*, 501 U.S.

---

[11]Defendants point to *United States v. Cappas*, 29 F.3d 1187 (7th Cir. 1994) for the proposition that conflated factual descriptions mandate reversal because they allow for multiple § 924(c) sentences for the same offense. *Cappas*, however, relied on the fact that the conflated facts made it impossible for the appellate court to ascertain whether the jury properly followed the law and actually found that a firearm was used during each necessary predicate offense. *Id.* at 1195. In this case, with a bench trial, we do not have to worry that the fact finder did not understand the law simply because she did not spell it out in detail.

957, 994 (1991). "The Supreme Court has never held that a sentence to a specific term of years, even if it might turn out to be more than the reasonable life expectancy of the defendant, constitutes cruel and unusual punishment." *United States v. Beverly*, 369 F.3d 516, 537 (6th Cir. 2004). Even a mandatory *life* sentence passes constitutional muster. *United States v. Kratsas*, 45 F.3d 63, 69 (4th Cir. 1995). Accordingly, we hold that the mandatory sentences imposed on defendants in this case, while lengthy, do not constitute cruel and unusual punishment pursuant to the Eighth Amendment.

Defendants' arguments under the Equal Protection and Due Process Clauses are equally unavailing. Defendants acknowledge that § 924(c) violates the Equal Protection and Due Process clauses only if they can demonstrate that the statute lacks a rational basis. Appellants' Br. at 77. The statute easily meets this standard. Discouraging and preventing the use of firearms in the commission of crimes of violence constitutes a legitimate state purpose. *See United States v. Angelos*, 433 F.3d 738, 754 (10th Cir. 2006). In addition, mandatory sentencing rationally relates to this legitimate purpose by incapacitating those who have demonstrated a willingness to engage in this behavior and deterring those who may contemplate engaging in this behavior. *Id.* Therefore, we hold that the mandatory § 924(c) sentences imposed in this case violate neither equal protection nor due process.[12]

### F. The Use of Caliph's Statements at Trial

The defendants argue that it was a violation of the Sixth Amendment's Confrontation Clause for the district court to admit the state-

---

[12]Defendants also argue that the mandatory sentences in this case violate separation of powers principles by placing sentencing decisions in the hands of the legislature and not the judiciary. This argument has been roundly rejected. *See*, *e.g.*, *Chapman v. United States*, 500 U.S. 453, 467 (1991)("Congress has the power to define criminal punishments without giving the courts any sentencing discretion."); *Rummel v. Estelle*, 445 U.S. 263, 274 (1980) ("[O]ne could argue without fear of contradiction by any decision of this Court that for crimes concededly classified and classifiable as felonies, . . . the length of the sentence actually imposed is purely a matter of legislative prerogative.").

ments of their co-defendant, Caliph, against them without allowing them the opportunity to cross-examine him. They contend that the district court improperly considered Caliph's statements to FBI agents that the paintball activities were intended to be training for jihad overseas, and that the trainees obtained AK-47-style weapons because that was the type of weapon used in combat overseas without allowing them the opportunity to cross-examine Caliph on that point. Specifically, they argue that the district court improperly used Caliph's statements against them, even though they were supposed to be admitted only against Caliph. For the following reasons, we hold that, to the extent that the admission of these statements was in error, the error was harmless.

The Supreme Court has recently held that, under the Sixth Amendment, "testimonial" out-of-court statements, such as those made during police interrogation, are inadmissible against a defendant unless that defendant has had the opportunity to cross-examine the declarant. *Crawford v. Washington*, 541 U.S. 36, 68-69 (2004). Defendants argue that Caliph's statements were testimonial because they were the result of police interrogation, and that they were admitted without the defendants having the opportunity for previous cross-examination. The government responds that defendants waived their right to cross-examine Caliph over these statements because they did not affirmatively ask the court to retain Caliph for cross-examination before he was acquitted.

We do not reach the question of whether Caliph's statements were admitted in violation of the Sixth Amendment because, to the extent that any error occurred, it was harmless. *See Lilly v. Virginia*, 527 U.S. 116, 139-40 (1999) (noting that Confrontation Clause errors are subject to harmless error analysis). Under harmless error analysis, if the government can demonstrate that the alleged error did not affect the defendants' substantial rights, we will not overturn the conviction on the basis of that error. *United States v. Rodriguez*, 433 F.3d 411, 416 (4th Cir. 2006).

The district court expressly found that Caliph's statement was "cumulative of other testimony," including "at least three or four other witnesses who essentially said the same thing." J.A. 3268. The court also expressly noted that Caliph's testimony was not the main piece

of evidence on which it relied for its characterization of the paintball group and that "[t]here was tons of other evidence besides the statement of Caliph." J.A. 3269. The court concluded that the admission of Caliph's statement was harmless in light of the "other evidence on the same issue." *Id*. Our independent review of the record confirms that Caliph's statements were duplicative of a wealth of other evidence and that the defendants' convictions and sentences would not have differed had Caliph's statements not been admitted. *See*, *e.g.*, J.A. 3178-80 (statement of Yusuf Wells, an outside observer of the paintball activity expressly found credible and reliable by the district court, indicating that paintball was a means of training); *Id.* at 3180 (statements of other witnesses saying same). We therefore reject defendants' argument that the admission of Caliph's statements constitutes reversible error.

G. The Use of Chapman's Statements against Him for the Purposes of Impeachment.

Chapman testified at trial that he attended the LET camps and did not hide his attendance because his motives were innocent. The government impeached this testimony by introducing un-*Mirandized* statements that Chapman made to FBI agents that he did not attend the LET camps. Chapman contends that these statements, which he made to FBI agents after being held in near solitary confinement for weeks and which the district court found were obtained in violation of *Miranda*, were also involuntary. As such, Chapman argues, they were not useable against him for any purpose. This argument fails.

The parties agree that statements obtained in violation of *Miranda* can be used to impeach a witness, but statements that were made involuntarily cannot be used against a defendant at all. *See*, *e.g.*, *Mincey v. Arizona*, 437 U.S. 385, 398 (1978) (noting that involuntary statements are statements made that were not the product of rational or free will). The issue before us is whether the statements in question were involuntary. Though we "must make an independent determination on the issue of voluntariness, the district court's findings of fact on the circumstances surrounding the confession are to be accepted unless clearly erroneous." *United States v. Cristobal*, 293 F.3d 134, 140 (4th Cir. 2002).

In this case, the district court found that:

> although Chapman's statements were procured in violation of his constitutional rights under *Miranda*, they were not involuntary under *Mincey*. There was no evidence that government agents coerced Chapman's statements through physical pressure or imminent threats of physical harm. Moreover, the statements were false exculpatory statements rather than admissions, which suggests that Chapman's decision to make the statements was a calculated one, and thereby that his rational intellect and free will had not been overborne. For these reasons, the statements were not excluded for purposes of impeachment.

J.A. 3383.

Our review of the record in this case indicates that the district court did not clearly err in making its factual findings concerning the confession, so we accept them as true. *See* J.A. 244-80 (indicating that Chapman received medical attention from the FBI before the interrogation and providing no indication of physical force or threats of physical force against him).

For the statements to be off limits to cross-examination as "involuntary," the facts would have to show that they were not "the product of a rational intellect and a free will." *Mincey*, 437 U.S. at 398 (internal quotation omitted) (regarding the interrogation of a seriously wounded defendant suffering unbearable pain, almost in a coma, lying on his back in an intensive care unit encumbered by tubes, needles, and breathing apparatus). "To determine whether a defendant's will has been overborne or his capacity for self determination critically impaired, [we] must consider the 'totality of the circumstances,' including the characteristics of the defendant, the setting of the interview, and the details of the interrogation." *Cristobal*, 293 F.3d at 140. In this case, the totality of the circumstances indicates that Chapman's statements were voluntary. Chapman freely answered some questions and declined to answer others. He joked with the agents, told them that he did not need his rights read to him, and seemed anxious to talk with them. On this record, the district court's refusal to find Chap-

man's statements to be involuntary was correct. Accordingly, use of those statements on cross-examination was appropriate.[13]

## H. Selective Prosecution

Defendants finally argue that the district court erred in denying them discovery on their selective prosecution claim. Specifically, they contend that the government has not investigated and prosecuted other alleged terrorist organizations, such as the Cambodian Freedom Fighters or the Irish Republican Army, as aggressively as it has investigated and prosecuted them, leading to an unconstitutional denial of their right to equal protection under the law."

A selective-prosecution claim asks a court to exercise judicial power over a 'special province' of the Executive" and, accordingly, must pass a high threshold in order to succeed. *United States v. Armstrong*, 517 U.S. 456, 464 (1996). The Executive's discretion is not, however, limitless. Equal protection demands that "the decision whether to prosecute may not be based on an unjustifiable standard such as race, religion, or other arbitrary classification." *Id.* (internal quotation omitted). In addition, "[a] defendant may demonstrate that the administration of a criminal law is directed so exclusively against a particular class of persons . . . with a mind so unequal and oppressive that the system of prosecution amounts to a practical denial of equal protection of the law." *Id.* at 464-65 (internal quotation omitted).

In order to obtain discovery on a selective prosecution claim, a defendant must make "a credible showing of different treatment of similarly situated persons." *Id.* at 470. This showing "should itself be a significant barrier to the litigation of insubstantial claims." *Id.* at 464. In deference to executive discretion, we have held that "defen-

---

[13]Even if it was error to allow Chapman to be cross-examined on the basis of the false exculpatory statements at issue, the error was harmless. The statements were relevant only to undermine Chapman's credibility. Yet, the district judge specifically noted that she found many reasons to question Chapman's credibility, and that her conclusions about his lack of credibility "were not based solely or even to any significant degree on that particular false exculpatory statement." J.A. 3271.

dants are similarly situated when their circumstances present *no* distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them." *United States v. Olvis*, 97 F.3d 739, 744 (4th Cir. 1996) (emphasis added). Finally, "when we review a district court's discovery order in support of a selective-prosecution claim, we are determining the legal adequacy of the evidence. We review the legal adequacy of evidence de novo." *Id.* at 743.

In the present case, defendants do not make a showing that the other alleged terrorist groups about which they complain are "similarly situated" to them for purposes of selective prosecution. Defendants contend that "the only distinguishing factor between [the other alleged terrorist groups] and the appellants, is that the appellants are Muslim in a post-9/11 world." Appellant's Br. at 88. This contention, however, misses the very obvious fact that defendants were accused of supporting LET, a terrorist group that supported the Taliban and Al-Qaeda, which were in direct conflict with the United States. The Executive branch has the right to focus its prosecutorial energies on alleged terrorists groups that present the most direct threat to the United States and its interests. Accordingly, we hold that the district court did not err in denying discovery on defendants' selective prosecution claim because the available evidence demonstrates that legitimate prosecutorial factors motivated the government's prosecutorial decisions.

In short, we hold that all of the convictions in this case were supported by substantial evidence and were obtained without material error. We also hold that Khan's and Chapman's sentences were correctly imposed. Accordingly, we affirm all of the convictions for all three defendants and the sentences of Khan and Chapman.

IV.

The government cross-appeals Hammad's sentence, arguing that the district judge erred in reducing Hammad's sentence below the recommended Sentencing Guidelines range. This cross-appeal causes us once again to consider what makes a federal sentence "reasonable" after *United States v. Booker*, 543 U.S. 220, 264 (2005) ("The courts of appeals review sentencing decisions for unreasonableness."). For

the reasons discussed below, we hold that, under our precedent, Hammad's sentence represents an unreasonable downward variance from his recommended guideline range and, as a result, we remand for re-sentencing.[14]

In *United States v. Green*, 436 F.3d 449, 455-56 (4th Cir. 2006), we held that

> to sentence a defendant, district courts must (1) properly cal-culate the sentence range recommended by the Sentencing Guidelines; (2) determine whether a sentence within that range and within statutory limits serves the factors set forth in [18 U.S.C.] § 3553(a) and, if not, select a sentence that does serve those factors; (3) implement mandatory statutory limitations; and (4) articulate the reasons for selecting the particular sentence, especially explaining why a sentence outside of the Sentencing Guideline range better serves the relevant sentencing purposes set forth in § 3553(a).

*Id.* We also emphasized that any variance from the Guidelines range must be based on the § 3553(a) factors and further indicated that, for sentences falling outside of the Guidelines range, a district court must provide an adequate statement of reasons for the variance and rely on permissible factors in making the variance. *Id.* at 456-57. Finally, we noted that a reasonable sentence cannot give "excessive weight" to any relevant factor and must "effect[ ] a fair and just result." *Id.* at 457.

We later enhanced this understanding of reasonableness in *United States v. Moreland*, 437 F.3d 424 (4th Cir. 2006), noting that, while the district court does not need to discuss the § 3553(a) factors in checklist fashion, the court must explain the reasoning behind any sentence, particularly sentences that vary from the range recom-

---

[14]We note that the district court sentenced Hammad on July, 29, 2005, without the benefit of our precedent in *United States v. Green*, 436 F.3d 449 (4th Cir. 2006), or *United States v. Moreland*, 437 F.3d 424 (4th Cir. 2006). Accordingly, our conclusion that Hammad's sentence does not accord with those precedents is not meant in any way as criticism of the district court.

mended by the Guidelines. *Id.* at 433. In particular, we held that "[t]he farther the court diverges from the advisory guideline range, the more compelling the reasons for the divergence must be." *Id.* at 434.

With this guidance in mind, we now turn to the sentence in this case. The parties agree that the district judge properly calculated Hammad's Guidelines range as 97-121 months imprisonment. The 52-month sentence imposed on him therefore reflected a significant reduction.[15] The district court explained the reduction as follows:

> Among the things that the Court is required to look at under section 3553(a) [are] any disparities that might arise among defendants with similar records and found guilty of similar conduct. Both Mr. Surratt and Mr. [Hammad] had military experience, as I recall. Both of them had completely clean records, and I think their overall participation in the paint-ball and the activities that led to their convictions was roughly equivalent.

> There are some differences which I have taken into consideration. For example, there was evidence during the trial about conversations between this defendant and Mr. Royer about the investigation that was going on. As you recall, there [were] discussions about the destruction of computer files and that sort of thing, which suggests to me perhaps a slightly higher level of culpability but not significantly so.

> I think that an appropriate sentence, taking into consideration what this defendant did, his background, and the needs for the sentence reflecting the seriousness of the offense to promote respect for law and also, however, to be just punishment, to serve as adequate deterrence to those in the public, to protect the public from further harm from the defendant, that a proper sentence is much closer to that that was imposed on Mr. Surratt.

> And for those reasons, it is the sentence of the Court that as

---

[15]Hammad's sentence was still within the statutory range.

to . . . the three counts of conviction . . . the defendant be committed to the custody of the Bureau of Prisons for a period of 52 months.

J.A. 3448-49. Surratt had earlier been sentenced to 46 months.

We first note that the variance in this case reduced Hammad's sentence from his recommended guidelines sentence by almost half. Accordingly, under the principles outlined in *Moreland*, the district court must present compelling reasons for the variance. The judge indicated that she considered

what this defendant did, his background, and the needs for the sentence reflecting the seriousness of the offense to promote respect for law and also, however, to be just punishment, to serve as adequate deterrence to those in the public, to protect the public from further harm from the defendant . . . .

J.A. 3448-49. However, the sentence reduction imposed focused almost exclusively on Surratt's sentence. It was not, at heart, the necessary independent review of all of the § 3553(a) factors culminating in a sentence. It was, instead, an independent review of all of the § 3553(a) factors culminating in the conclusion that Hammad's sentence should be similar to Surratt's. This process provided "excessive weight, " *Green*, 436 F.3d at 457, to "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). The variance, by focusing almost exclusively on Surratt's sentence, did not give proper weight to the other § 3553(a) factors and, accordingly, led to an unreasonable sentence.

Moreover, the facts do not support the district court's conclusion that Hammad and Surratt were similarly situated. Surratt was the second of the eleven defendants to plead guilty, only one day after the first defendant to do so. Surratt accepted responsibility and cooperated by providing information that led to a superseding indictment against his co-conspirators, and then testifying as a witness at trial. The district court gave Surratt a three-level sentence reduction for that acceptance of responsibility.

In contrast, Hammad gave false statements to investigators and destroyed evidence before trial, in addition to providing "incredible" testimony at trial. As a result, the district judge enhanced Hammad's sentencing level by two for obstruction of justice. In other words, the difference between the recommended sentencing ranges for Surratt and Hammad reflect the fact that Surratt accepted responsibility and provided valuable assistance to the government, while Hammad never accepted responsibility and obstructed justice both before and during his trial.

By giving Hammad a significant sentence reduction on the theory that he was "similarly situated" to Surratt, the district court impermissibly ignored the primary reason that Hammad and Surratt had different recommended Guidelines ranges in the first place: the fact that the Guidelines treat those who accept responsibility and those who obstruct justice differently. We cannot accept the district court's conclusion which, in effect, provides no benefit to Surratt for substantially assisting the government and provides no punishment to Hammad for obstructing justice. Such a conclusion both ignores Congress' determination concerning how to treat obstruction of justice and acceptance of responsibility, and potentially discourages beneficial behavior from future defendants.

We accordingly remand with instructions to re-sentence Hammad in accordance with the principles outlined in *Green* and *Moreland.*

V.

In conclusion, we hold that all of the convictions in this case were supported by sufficient evidence and were obtained without material error. We affirm those convictions and the sentences of Khan and Chapman. We further hold that Hammad's sentence was an unreasonable variance from his recommended guideline range and remand for re-sentencing.

*AFFIRMED IN PART; REMANDED IN PART*

GOODWIN, District Judge, concurring in part and dissenting in part:

I concur in the majority opinion except as to Part III.D, which affirms sentences imposed under 18 U.S.C. § 924(c) for Seifullah

Chapman and Masoud Khan. Though I agree we should affirm Chapman's § 924(c) sentences, I would merge Khan's § 924(c) convictions and remand for the imposition of one sentence of 120 months for his three gun convictions.

I.

The Superseding Indictment charges sixteen separate violations of 18 U.S.C. § 924(c). J.A. 151-52. Most of the counts charge multiple defendants and include the use of different firearms in different locations on different dates. The shotgun-style Indictment simply lists the defendants involved, the approximate dates, the firearms used, and the general location for each count in less than one page. No attempt is made to provide notice to the defendants as to which counts are tied to which underlying predicate offenses. Instead, the Indictment ties the sixteen alleged § 924(c) violations to all offenses outlined in Counts 1-10, which is troubling because not all defendants charged in the gun counts are charged in each of the first ten counts. J.A. 151.

Khan received three convictions under § 924(c). For each count Khan was convicted of, the Indictment lists "Khan, Royer, Chapman, and Abdur-Raheem" as the defendants involved. Rather than provide exact dates, as do most of the other gun counts, the Indictment alleges Counts 24-27 occurred in "October 2001." The location is not specific but rather lists the entire country of "Pakistan." The only distinction made relates to the type of firearm used — Count 24 charges the use of an AK-47 automatic rifle; Count 25 the use of a 12mm antiaircraft gun; and Count 27 the use of a rocket-propelled grenade. In a footnote, the district court explained the limited nature of Khan's use of these weapons: "We accept the defendants' evidence that the firing of these weapons was highly limited in that very little ammunition was provided." J.A. 3195. According to the evidence, Khan fired only one bullet with each weapon at some form of target. *Id*.

For these three convictions, Khan received mandatory consecutive sentences: 120 months for the first § 924(c) conviction, 300 months for the second, and life in prison for the third. Judge Brinkema explained that she was compelled to impose the sentences. *Id*. at 3308. She stated that these crimes were serious, "but there are murderers who get far less time than this, and I have sentenced Al-Qaeda

members who were planning real attacks on these shores for far less time . . . and I have to tell you that this is sticking in my craw." *Id.*

## II.

Unlike most circuits,* we allow multiple § 924(c) convictions for conduct in the same underlying offense. *United States v. Camps*, 32 F.3d 102, 107-08 (4th Cir. 1994). By allowing convictions for multiple gun uses, even if during the same underlying conspiracy, we comply with congressional intent to harshly punish the use of guns to commit felonies, and to punish subsequent uses of guns even more harshly. *See id.* at 108 (citing 114 Cong. Rec. 22231 (1968)) ("We are also satisfied that this interpretation best achieves section 924(c)(1)'s unmistakable objective of 'persuading the man who is tempted to commit a federal Felony to leave his gun at home.'"). If multiple § 924(c) convictions were not permissible for the same underlying offense, no deterrent would exist for criminals using guns throughout an extended conspiracy.

Our rule's justification is apparent from examining our decisions in *United States v. Camps* and *United States v. Luskin*, 926 F.2d 372 (4th Cir. 1991). In *Camps*, the defendant received eight convictions under § 924(c). *Camps*, 32 F.3d at 105. For sentencing purposes, however, these convictions were grouped, which resulted in only three § 924(c) sentences. *Id.* The first sentence was imposed for the use of an AK-47 during a December 23, 1989 ambush of a rival drug boss. *Id.* at 103. The second sentence was imposed for a conviction for the use of an AK-47 and a conviction for the use of an Uzi during another ambush on January 7, 1990. *Id.* at 103-04. The third sentence was imposed for carrying five separate semi-automatic weapons that were seized from a van that the defendant was using to flee. *Id.* at 104.

---

*\*United States v. Anderson*, 59 F.3d 1323 (D.C. Cir. 1995); *United States v. Cappas*, 29 F.3d 1187 (7th Cir. 1994); *United States v. Lindsay*, 985 F.2d 666 (2d Cir. 1993); *United States v. Sims*, 975 F.2d 1225 (6th Cir. 1992); *United States v. Moore*, 958 F.2d 310 (10th Cir. 1992); *United States v. Hamilton*, 953 F.2d 1344 (11th Cir. 1992); *United States v. Privette*, 947 F.2d 1259 (5th Cir. 1991); *United States v. Fontanilla*, 849 F.2d 1257 (9th Cir. 1988). *But see United States v. Mabry*, 3 F.3d 244 (8th Cir. 1993).

Judge Luttig, writing for the court, explained that for that case only, the court accepted the government's concession that multiple firearms carried at one time can result in only one § 924(c) sentence. *Id*. at 109 n.9. I would apply this rule to all cases where the different firearms relate to the same objective, have the same effect on the predicate crime, and are used or carried proximately in time.

In *Camps*, though each grouped "use" was tied to the underlying drug conspiracy, each "use" was directed toward a different objective of the conspiracy, occurred at distinctly different times, and had different effects on the conspiracy. Criminalizing only the December 1989 use would not account for the fact that the defendant made the criminal decision to use more guns later to further other objectives of the conspiracy. Three § 924(c) sentences were justified to account for the defendant's multiple uses of firearms.

Multiple sentences under § 924(c) were also justifiable in *Luskin*, the case on which the majority relies. Luskin hired someone to kill his wife. On three distinct occasions, the hitman attempted the murder. *Luskin*, 926 F.2d at 373 (stating the first attempt was on March 9, the second attempt May 30, and the third attempt July 27). The court imposed a separate § 924(c) sentence for each attempt. *Id*. at 374. The attempts, each nearly two months apart, were sufficiently distinct to justify multiple sentences. *Id*. at 375 (explaining that before the third attempt, Luskin offered a $25,000 bonus, and stating Luskin could have called off the hired gun at any time).

With respect to Khan, however, multiple § 924(c) sentences are not justifiable.

III.

In applying *Camps* and *Luskin*, we must determine how many "uses" are represented by the acts a defendant performed with firearms. *See Camps*, 32 F.3d at 109 ("Because there were *three separate uses and/or carryings* of the weapons . . . .") (emphasis added). The majority's decision in this case fails to consider whether the underlying uses were sufficiently distinct to justify multiple sentences. Instead, the majority opines that "there is no housekeeping requirement under the statute or *Luskin* obliging either the govern-

ment or the district court to present the facts in such a manner as to align the use of a particular firearm with a particular predicate offense." *Op.* at 22. Examining whether a defendant's conduct contains sufficiently distinct "uses" to justify multiple § 924(c) sentences is much more than a housekeeping requirement. It is necessary to ensure the defendant receives a fair sentence and is not punished separately for conduct that should be merged for sentencing purposes.

Under the majority's reasoning, no boundaries exist for § 924(c) prosecutions. That is, a drug conspirator could pick up a gun, place it on the table to scratch his nose, pick it back up, and receive two § 924(c) sentences. An itchy nose could cost him an additional fifteen years. Likewise, a defendant could carry three dangerous weapons at one time, be convicted of three § 924(c) sentences, and receive a life sentence. Applying this statute without boundaries of reason and ordinary meaning leads to absurd results.

In determining how to draw the boundaries, courts examine a number of factors but primarily focus on the objectives, the effects, and the timing of the defendant's conduct. *See United States v. Finley*, 245 F.3d 199, 206-08 (2d Cir. 2001); *United States v. Wilson*, 160 F.3d 732, 749 (D.C. Cir. 1998); *United States v. Lucas*, 932 F.2d 1210, 1222-23 (8th Cir. 1991). Where the "uses" of a defendant have substantially the same objective, substantially similar effects on the predicate offense, and are proximate in time to one another, our justification for sustaining multiple § 924(c) sentences does not exist.

Sustaining three § 924(c) sentences for Khan's convictions creates a result Congress surely did not intend. The evidence discloses only one objective Khan had when firing the weapons, which was to enhance his training in preparation for moving into Afghanistan. As Judge Brinkema noted, the evidence on Khan's firing of the weapons was highly limited. J.A. 3195. No evidence exists to suggest that each so-called "use" of the weapons had any kind of different effect on the predicate conspiracy. There is no evidence to accurately determine the temporal proximity of the firings. The Indictment does not even attempt to distinguish the timing of each use, but merely lists each of Khan's uses as occurring in October 2001. J.A. 152. From the evidence, it is impossible to determine if Khan's firings had separate objectives, different effects on the conspiracy, or occurred at times

not sufficiently proximate to justify multiple sentences. Evidence does not exist in the record to conclude the firings constitute separate and distinct "uses" for sentencing purposes. Accordingly, I would merge the three § 924(c) convictions for sentencing purposes, and would remand with instructions to impose a sentence of 120 months for these convictions.